UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SAMUEL R. AMEDURI, III,

                                    Plaintiff,                    6:11-CV-50
          vs.                                                     (NAM/DEP)


THE VILLAGE OF FRANKFORT, STEVEN
CONLEY, As Chief of Police of the Village of
Frankfort Police Department and in his
Individual Capacity, and DAN HERRMAN as a
Police Officer in the Village of Frankfort Police
Department and in his Individual Capacity,

                                    Defendants.
_____

**APPEARANCES:**                              **OF COUNSEL:**


THE TUTTLE LAW FIRM                     James B. Tuttle, Esq.
10 Century Hill Drive, Suite 4
Latham, New York 12110
*Attorneys for the Plaintiff*

MARTIN & RAYHILL, P.C.                        Kevin G. Martin, Esq.
421 Broad Street
Utica, New York 13501
*Attorneys for Defendants*
 *Village of Frankfort and*
 *Steven Conley*

BAILEY KELLEHER & JOHNSON, P.C.        William C. Firth, Esq.
Pine West Plaza 5, Suite 507
Washington Avenue Extension
Albany, New York 12205
*Attorneys for Defendant Dan Herrman*


**Norman A. Mordue, U.S. Senior District Judge**

**MEMORANDUM-DECISION AND ORDER**

I.       **INTRODUCTION**

Plaintiff is a police officer employed by the Village of Frankfort, currently out of work due to injuries suffered as a result of an incident that occurred during the course of events that are the subject of this litigation. Plaintiff brings this action against the defendants Village of Frankfort, former Police Chief Steven Conley in his individual and official capacities and former police officer Dan Herrman in his official and individual capacities under § 1983 alleging violations of his First, Fourth, Fifth, Eighth and Fourteenth Amendment rights for events that occurred on February 22, 2010, and during the months thereafter.

The fundamental allegation is that defendant Conley, while he was the Chief of Police for the Village of Frankfort, beat and seriously injured plaintiff when he refused to change testimony he had previously given in order to aid defendant Conley in defeating litigation brought against him and the Village of Frankfort by one Harold Griffin. Plaintiff further alleges that after this incident, defendant Herrman, another officer employed by the Village of Frankfort Police Department, then investigated him personally to discredit his anticipated litigation against defendants Conley and the Village by, among other things, unlawfully obtaining his cell phone records on 4 separate occasions. Plaintiff alleges that defendant Herrman was criminally prosecuted for having unlawfully obtained plaintiff's cell phone records and pled guilty to one count of Forgery, a Class D Felony, and one count of Official Misconduct, a Class A Misdemeanor.

The complaint asserts causes of action under § 1983 and § 1988 against all defendants, against the Village under *Monell* principles and pendent state law claims. Plaintiff also seeks punitive damages defendants Conley and Herrman. Presently before the Court are three motions. Defendants move separately for partial summary judgment of plaintiff's claims and plaintiff

2

cross-moves for partial summary judgment.

## II.    RELEVANT FACTUAL BACKGROUND

The facts as set forth in plaintiff's complaint are as follows:  Prior to February 22, 2010, defendant Conley became involved in disputes, disagreements and/or altercations with, among others, an individual named Harold Griffin on two separate occasions.[1]  Prior to February 22, 2010, defendant Conley also became involved in disputes, disagreements and/or altercations with, among others, an individual named Daniel Enea.  The afore-referenced disputes, disagreements and/or altercations between defendant Conley and Griffin and Enea all occurred while defendant Conley was acting in his capacity as Chief of Police of the Village of Frankfort.  Plaintiff was an eyewitness to some of the conduct involved in the disputes, disagreements and/or altercations between defendant Conley and Griffin.

During the course of inquiries into the incidents between defendant Conley and Griffin, plaintiff gave statements and/or information which was truthful but which did not favor defendant Conley.  Defendant Conley ordered plaintiff to change the statement to omit portions that did not favor him.  On multiple occasions prior to February 22, 2010, defendant Conley approached plaintiff and demanded that he give oral testimony with regard to the incident with Griffin that favored Conley, which plaintiff declined to do.

With regard to the incidents between Conley and Enea, plaintiff was not directly involved,

---

[1]

Two actions by plaintiff Harold Griffin that were commenced in Herkimer County Supreme Court were removed to this Court by the defendants sued therein - *Harold D. Griffin v. Village of Frankfort, New York, Steven Conley, Samuel Ameduri, Frank Moracco, Ronald Vivacqua and Jeffrey Viola* (6:09-CV-717) (NAM/DEP) and *Harold Griffin v. Village of Frankfort, New York and Steven Conley*, (6:10-CV-627) (NAM/DEP).  This Court issued decisions after summary judgment motions were made in both cases.  Both actions were ultimately remanded to state court for further proceedings in August 2013 and this Court presumes settlement or trial.

but he was friendly with Enea's stepmother.  On multiple occasions prior to February 22, 2010, Conley approached plaintiff and urged him to intervene with Enea's stepmother on his behalf to persuade Enea to drop the charge he was pressing against Conley, which plaintiff declined to do.

On February 22, 2010, at approximately 8:15 p.m, plaintiff was on-duty performing his functions as a Village of Frankfort police officer.  At the time he was in his police cruiser in the parking lot entrance of the Herkimer County Fairgrounds in Frankfort, New York.  Defendant Conley drove into the parking entrance from Cemetery Road and parked his vehicle parallel to plaintiff's assigned vehicle but heading in the opposite direction.  Defendant Conley then directed plaintiff to exit his vehicle, and plaintiff complied.  Defendant Conley exited his vehicle as well. As they stood between the two police cars, defendant Conley reiterated his demand that plaintiff lie and give false testimony regarding Conley's incidents with Griffin so as to assist Conley in the ongoing investigation of those incidents and that he intervene with Enea's stepmother on threat of plaintiff's employment with the Village Police Department.

When plaintiff refused to give false testimony or to intervene, defendant Conley assaulted plaintiff, picking him up by the throat and hurling him bodily onto the trunk of plaintiff's police cruiser from which position he slid off onto the ground, injuring his back, knee, shoulder and elbow.[2]

On March 16, 2010, defendant Herrman, at the direction of defendant Conley, submitted to Verizon Wireless an "Emergency Information Request" form seeking plaintiff's cell phone records for the period February 22, 2010, through February 26, 2010.  By signing the Emergency

---

[2]

Thereafter, plaintiff filed for and received workers compensation benefits as a result of the injuries he received on February 22, 2010.

4

Information Request Form, defendant Herrman represented to Verizon Wireless that he was a law enforcement officer authorized by applicable law to request the information and that there was an immediate danger of death or serious physical injury to a person requiring that the information requested be provided without waiting for a court order. The Emergency Information Request Form was false and fraudulent because there was no danger of death or serious physical injury to a person that required the production of plaintiff's cell phone records. Plaintiff alleges that the "true reason" defendants Herrman and Conley were seeking hiss cell phone records was to discredit him in the civil and criminal proceedings they knew would follow the incident of February 22, 2010. Plaintiff served defendant Conley with a Notice of Claim on March 26, 2010, pursuant to §50-e of the General Municipal Law based on the incident of February 22, 2010.

On March 26, 2010, plaintiff received a phone call from defendant Conley in which defendant Conley threatened his life, saying "You and Pat [referring to Pat Fracolla, another Frankfort Police Officer and a friend of plaintiff] arc dead, little boy." According to plaintiff, throughout his tenure as Chief of Police in the Village of Frankfort, defendant Conley always drove a department-owned vehicle - a black Crown Victoria with dark tinted windows - and "no one else in the Department was allowed to drive or even go into the vehicle." On April 14, 2010, defendant Conley stopped his vehicle in front of plaintiff's house and sat there for a period of time, putting plaintiff in fear for his life. Plaintiff complained of defendant Conley's conduct to, among others, James Getman from the Town of Frankfort Police Department, and Officer Getman undertook to investigate the merits of plaintiff's complaints. On May 17, 2010, defendant Conley issued a memorandum to all officers in the Village of Frankfort Police Department instructing the

officers not to speak to Jim Getman about anything or for any purpose because "Jim Getman is currently working with Sam Ameduri in an attempt to discredit this Department and the officers employed by this Department."

On August 10, 2010, plaintiff filed a second Notice of Claim against the Village based on the defendants having wrongfully obtained his cell phone records in violation of the Electronic Communications Privacy Act of 2006 and the Fourth Amendment. On or about September 21, 2010, the defendant Village commenced disciplinary proceedings against plaintiff based on information placed in plaintiff's personnel file by defendant Conley without plaintiff's knowledge and·on materials falsely generated by other officers in the department who were pressured by defendant Conley to do so. The pendency of the disciplinary charges forced plaintiff to obtain counsel to represent him, all at significant cost and expense, and put him in jeopardy of losing his job with the Department. Plaintiff alleges that the disciplinary proceedings were not brought for any legitimate purpose but were brought to retaliate against him for filing the two Notices of Claim against defendants.

Topix.com is a website or chatroom frequented by members of the police community in Central New York. Since February 26, 2010, there has been a steady stream of comments posted on Topix.com defaming plaintiff and his father, Sam Ameduri, Jr., all or which plaintiff asserts are attributable to defendant Conley. A list and summary of some of those Topix.com publications include the following:

! February 26, 2010: "Sam Ameduri, Sr. and Sam Ameduri, Jr. are psychopathic women beaters"

! August 18, 2010: "Sam made false allegations about Steve because he didn't get promoted as supervisor investigator or sergeant."

6

| ! | October 15, 2010: | Topix.com article entitled "Sam Ameduri" with statement underneath "I wish him dead" |
| ! | October 16, 2010: | Statement on Topix.com: "I wish Sam and his father dead." |
| ! | October 27, 2010: | Topix.com article stating that "Sam is on permanent disability in that he is psycho." |
| ! | October 29, 2010: | Topix.com article accuses plaintiff of using cocaine, flashing a gold police badge, carrying a police radio and gun and driving drunk; asserts that plaintiff is on "psycho leave from the department" in violation of HIPAA. |

Plaintiff believes the publication of these false and defamatory remarks about him and his family is an attempt by defendant Conley to threaten, harass, intimidate and retaliate against him for pursuing criminal and civil remedies against him.

Frank Moracco, the Mayor of the Village of Frankfort testified on behalf of the defendant Village concerning the hiring of defendant Conley as a Police Officer and future Chief for the Village of Frankfort. Moracco testified that the first time it came up for a vote, he was a member of the Village Board and he voted "no" because he had read in the papers that Conley had "issues" while he was employed with the City of Utica Police Department. Moracco said he and another member named Jim Sgroi went to Utica and interviewed the chief and assistant chief of the Utica Police Department about Conley. Moracco said at first the two men were hesitant to discuss details of Conley's termination, but then opened up. Moracco asked if in the 15 years that Conley had worked for the Utica Police Department he ever had any "other" incidents, and the assistant chief said they had never had any other issues with Officer Conley. With respect to the issue that resulted in him getting terminated, Moracco said it had "something to do with the fact that he was making a deposit." Moracco said he read the article in the paper. The chief and assistant chief "did not highlight too much on the issue itself." Moracco said "[m]ost of what I

7

got was out of the paper and those were the questions that I raised. And some of them they did answer and some they wouldn't answer because of – I don't know if the case was – if there was going to be an appeal on the case." Moracco acknowledged that he did not read the formal arbitrator's award in Conley's case. However, Moracco did speak to an investigator named Anthony Puccinata who was a retired detective from the Utica Police Department. He did the initial investigation on Steve Conley for employment and had worked with the Utica Police for 25 years. According to Moracco he had nothing but good things to say about Conley. After hearing from the assistant chief and this detective, Moracco felt more comfortable in changing his vote from "no" to "yes" on Conley.

According to Moracco, defendant Conley was hired as a part-time police officer in November 2002. Within six months, Conley moved up to a full-time position and was promoted to sergeant. Moracco became the Mayor in 2004. In April 2005, Conley became Assistant Chief and approximately one month later, he was designated the provisional Chief of Police pending his successful score on a civil service test. However, at this time, there were three other candidates who had already successfully passed the required civil service exam for the Chief position. The Village Board then elected to offer the Chief of Police position to one of the three candidates named Ron Petrie from Little Falls. However, two or three days prior to when Petrie was supposed to start the job, Little Falls made him an offer and he elected to stay. The Village Board elected not to make offers to either of the other two candidates on the civil service list. Rather, the Board decided to put defendant Conley back into the provisional Chief position until another exam date came up. Consequently, Conley was appointed provisional Chief in October 2006 and finally permanent Chief after passing the civil service exam in June 2007.

Moracco testified that there has been a lot of tension between the Village of Frankfort Police Department and the Town of Frankfort Police Department. According to Moracco, the Village Police Department has been in existence for over 100 years while the Town Police Department just recently came into existence. The two agencies have had what Moracco described essentially as a "turf" war over the 96 miles of streets they that they patrol. Moracco said there have been ongoing and unsuccessful discussions between the two agencies about consolidation of services. Moracco was aware of controversy arising from this tension between Conley and Jim Getman of the Town of Frankfort Police Department in which Conley had used "vulgar" language. According to Moracco, there was a police call that occurred in the Village and Conley thought Getman should turn the individual being arrested over to him. Moracco told Conley he should "conduct himself as a professional" and apologize to Getman. However, Moracco didn't write Conley up for the incident. Moracco also thought that Getman, who was in charge of the Town Police Department, wanted to "make a name for himself "and "wanted complete control" over both agencies. Getman was in favor of consolidation of police services by the Town.

Moracco also testified concerning a report he received concerning a confrontation on Main Street between Conley and the Village coroner, Dan Enea. Enea was at a death scene with a Village police officer who happened to be his ex-fiancé, Officer Adrian Sansone. According to Moracco, Enea and Sansone got into a very verbal confrontation and defendant Conley finally went to the scene and told Enea that he did not appreciate his officers being yelled at and scolded in front of people. Enea also apparently called Officer Sansone on her cell phone at the police station and continued to badger her while she was on duty. As a result of this incident, defendant

9

Conley instructed another officer - Officer Congdon - who was at the scene with Enea not to assist him with removing the body out of the building. Moracco said he later heard on the news from Enea's attorney that Enea was making a claim the defendant Conley had assaulted him. Moracco did not recall asking an officer named Pat Fraccola to do an internal investigation of Enea's allegations.

Moracco acknowledged that plaintiff had approached him a number of times about forming a police union and Moracco told him he did not think it was cost-effective for the Village to form a union. However, ultimately, the police force was unionized in any event.

Moracco also acknowledged that plaintiff had complained to him about defendant Conley because Conley had not considered him for an investigator position. Moracco told plaintiff that the investigator position within the Village Police Department had been eliminated. Plaintiff told Moracco that he and Conley had gotten into an argument over the position and Moracco told him he was going to mediate between the two of them. Later that same evening Moracco said that plaintiff pulled into his driveway in his patrol car and said essentially that things had been worked out between he and Conley. Plaintiff told Moracco there was no need for a meeting, that he and Conley had straightened everything out. Moracco testified that plaintiff said "Everything is fine. You know, Steve is like my father. We lock horns all the time, but you know, we're both hardheaded and – we worked it out and everything's good." Moracco said this occurred in the late summer before the incident in February 2010. He does not know if plaintiff ever became an investigator.

Moracco denied that he had ever heard any complaints about plaintiff being responsible for spreading rumors or controversy about another officer in the Village Police Department

10

named Brandon Jones. According to Moracco, Jones was hired after he was fired from the City of Utica Police Department for beating up a veteran. This incident resulted in a large civil rights verdict against the City of Utica and Officer Jones. In spite of the controversy, the Village hired Officer Jones because he was a certified police officer. Moracco denied that plaintiff complained that Conley had blamed him for "letting the word out" about Jones. Moracco also denied that plaintiff ever complained to him about Conley trying to "pull the badge off his chest" on one occasion.

In connection with the incident of February 22, 2010, Moracco first learned of it when he was on his way to work and received a phone call from plaintiff on either plaintiff's cell phone or Getman's cell phone.[3] Plaintiff told Moracco that he should get in touch with defendant Conley. Moracco testified that plaintiff said "Don't let him come down to the village hall. My father's down here. He wants to beat up the chief and I don't want my father to get arrested." When Moracco asked plaintiff what he was talking about plaintiff told him to talk to Conley. Moracco then called Conley and asked what was going on between him and plaintiff and Conley didn't seem to know what Moracco was talking about. Conley was at a diner with plaintiff's father. Plaintiff called in sick for a few days after the alleged incident.

Moracco said that the Village Board met in executive session and decided to do an internal investigation concerning the allegations of the dispute between Conley and plaintiff. The Board originally wanted an individual named Marty Quinn to do the investigation but he was unavailable. The only full-time employee available who was not involved in the case was Dan

---

[3] There is no indication in Moracco's deposition of when this telephone conversation occurred.

Herrman.  So the Board elected to appoint Herrman to conduct the internal investigation.[4]
Moracco said that at one point they called troopers in to examine the vehicles for evidence of any type of scuffle in support of plaintiff's allegations and they could not find anything.  The Board did not know at the time that Herrman's official police certification had expired.  Moracco acknowledged that Herrman was later charged criminally in connection with the investigation and was terminated from his employment.  Conley retired because he had 20 years of service with the Department and his pension had vested.

Moracco said that after the incident in February between plaintiff and Conley that plaintiff began taping conversations with people including him.  Moracco acknowledged that he was aware of the website Topix.  He acknowledged reading it to see what comments were being made about the Village of Frankfort.  He referred to it as a "gossip column."  Moracco said he often read Topix but never posted items on the website from his own personal computer or any other computer.

According to defendant Herrman's deposition testimony, he had a series of jobs prior to working for the Village of Frankfort Police Department.  He worked for the Oneida County Sheriff's Office for one year prior to being terminated for no reason according to Herrman.  Then he worked for Sears as a loss prevention specialist but was fired after he was accused of stealing a television set.  He was working part-time with the Canastota Police Department at that time and resigned when he was accused of grand larceny by Sears.  Herrman had previously obtained a

---

[4]

In August 2010, Moracco testified at a hearing before the New York State Workers Compensation Board that he "[didn't know]" if an internal investigation had been conducted into the incident of February 22, 2010, and that if one had been done it would have been done by Officer Quinn.

Master's of Science Degree in Special Education so he went to worked for Jamesville-Dewitt School District after leaving his job with Sears and the Canastota Police Department. He worked for several different school districts in the area on and off over the years. He finally obtained employment as a part-time police officer with the Frankfort Police Department.

During the time relevant to this lawsuit, he was asked by Frank Moracco, the Mayor of the Village of Frankfort, to conduct an investigation into the charges plaintiff was raising against defendant Conley sometime after the incident in February 2010. Defendant Herrman testified that he saw a document that was prepared by the Villages's insurance company and signed by the Mayor indicating that an internal investigation of the incident was underway. Herrman was directed to report the findings of his investigation to the Mayor. Herrman testified that when he completed his investigation, his report was ultimately submitted to the Village's worker's compensation or disability insurance carrier.[5]

The first step defendant Herrman took in his investigation of defendant Conley was to review the video tape from the police station. Herrman did not speak to plaintiff about what his allegations were against Conley because plaintiff would not return his calls. Hermann said he went to plaintiff's house in an attempt to speak with him three times, but he was not home. He also left him a number of voice mail messages saying he was investigating his allegations, but plaintiff never called him back. He never sent plaintiff any letters. The only way that Herrman knew what plaintiff's allegations were is that he relied on what was in the report from the Mayor stating what he was told by the plaintiff. According to the report from the Mayor, plaintiff called

---

[5]

Later in his deposition, there was some question raised as to whether Herrman actually prepared a report or merely kept notes of his investigation.

him and said that he had been assaulted at the police station by defendant Conley. Specifically, plaintiff said that Conley had thrown him down the stairs from his office at the station. However, Herrman learned by reading the **newspaper**, that plaintiff was alleging he had been assaulted at the Herkimer County fairgrounds. Herrman testified that he went to the fairgrounds to investigate and found nothing in the way of evidence to support plaintiff's story. Hermann acknowledged that he did not request medical records from any of plaintiff's doctors.

Herrman did talk to defendant Conley about the night of February 22, 2010, and Conley told him that he was in his office speaking with another officer, Paul Michione, when plaintiff walked in, appearing distraught. Conley told plaintiff he did not want him in his office and that he would talk to him at a later time. According to Herrman, Conley said plaintiff left his office and he and Michione continued their conversation. Conley told Herrman that later, when he was headed home, he saw plaintiff sitting at the Fairgrounds in his patrol car running radar. Conley told Herrman that he pulled up door to door and apologized to plaintiff for yelling at him and told him to go back to the station and relax and that they would talk about "the situation" later. According to Herrman, "the situation" that plaintiff was concerned about was a personal matter involving Officer Michione that he was worried he had some culpability in.[6]

Insofar as defendant Conley's other interactions with plaintiff, Conley told Herrman that he had ordered plaintiff to pepper spray Harold Griffin as Griffin had alleged in his lawsuit against Conley, Ameduri and the Village. Herrman said Conley's statement was supported by a

---

[6]

The facts in Herrman's affidavit are not clear, but apparently, plaintiff was concerned because Michione was being investigated in connection with his other job and he and plaintiff attempted to cover up this fact with defendant Conley. The "cover up" was revealed when someone from the court involved in the charges called and spoke to Conley.

sworn deposition in the case file which Conley gave him to review. Herrman testified that plaintiff's allegations in the newspaper said he was being asked by defendant Conley to say that he didn't pepper spray Griffin. Herrman didn't think it made any sense to proceed further with this part of his investigation when Conley's statements were clearly supported by sworn testimony in the case file.

In connection with the allegations that Conley had assaulted plaintiff, Herrman said after plaintiff's story appeared in the paper, many witnesses came forward and he received a lot of phone calls concerning prior incidents where plaintiff had claimed to be injured and lawsuits plaintiff had filed previously. For example, Hermann testified that he heard plaintiff had previously sued a corrections officer for a false injury. Plaintiff also had been paid a large sum of money in Rochester for an incident where he claimed full disability.

According to Herrman, plaintiff also made threats to kill defendant Conley and another officer in the Village Police Department. Plaintiff's father came to the police station and threatened to kill Conley as well. Hermann said that Paul Michione told him that he was present at plaintiff's residence when plaintiff pointed a gun at Officer Dan Trevisani's stomach and said something to effect of "Go with my story, or I'll fuckin' kill you." When asked "what story was being referred to," Herrman stated he "[did]n't know but [he] believe[d it] would be the allegations that [plaintiff] was assaulted by the Chief." Herrman reported these threats to Town of Frankfort Police Department and the Herkimer County District Attorney's Office in an attempt to get plaintiff arrested but he could not get any of the people involved to go on the record with what they had witnessed.

Herrman testified that he submitted an Emergency Information Request Form to Verizon

Wireless on March 16, 2010, for plaintiff's cell phone records from February 22, 2010, through February 26, 2010, after he learned that plaintiff had made threats to kill people. Herrman had also learned that an individual named Charles Oblich had been asked by plaintiff to submit a fraudulent insurance claim concerning one of plaintiff's rental properties. Mr. Oblich also told Herrman that he was fearful of plaintiff's sporadic behavior and habit of "flashing guns" at people. Herrman acknowledged that Verizon only sent him the numbers called and received on plaintiff's cell phone. Verizon did not identify the persons or entities having those numbers. Herrman testified that he knew some of the numbers because they were in his phone. He called some of the numbers. He also used a computer in the police station to look up some of the numbers with a "reverse look up" service.

On March 21, 2010, Herrman submitted another Emergency Information Request Form to Verizon Wireless for plaintiff's cell phone records from February 27, 2010, through March 21, 2010. The "immediate threat" referenced in the request form referred to plaintiff's threats to Paul Michione, Dan Trevisani and Charlie Oblich.

On March 25, 2010, Herrman, submitted a third Emergency Information Request Form to Verizon Wireless for plaintiff's cell phone records from March 21, 2010, to March 25, 2010. He based the emergency nature of this request on the same threats that had supported the previous requests. For example, Charles Oblich told Herrman that he was fearful for his life, that plaintiff would "snap" and show up at his door, threatening to kill him for not falsifying an insurance record because he needed money from Oblich.

The final Emergency Information Request Form Herrman sent to Verizon Wireless was dated June 2, 2010, and requested plaintiff's cell phone records from April 26, 2010, through

April 29, 2010.  Herrman said he did not care about the records from March 26, 2010, to April 26, 2010.  He said he based the Emergency request on the allegation of a threat but he could not recall what it was at the time of it deposition.  Herrman did not report the threat to any police agencies because he said he ultimately found it "unfounded."

Herrman also acknowledged that as part of his investigation, he discovered that plaintiff was being investigated for a sex crime by the Madison County Sheriff's Office.  The specific allegations were that plaintiff has stolen[7] a gold badge from the Village of Frankfort Police Department and was "flashing it around" at a bar, harassing a number of women.

Herrman acknowledged that he was later criminally prosecuted for obtaining plaintiff's cell phone records.  He pled guilty to forgery in the second degree, a class D felony and official misconduct, a class A misdemeanor pursuant to an *Alford* plea.

Defendant Conley testified that he was employed with the Utica Police Department for 13 years prior to working for the Village of Frankfort.  During this time, he also worked part-time doing security details in a school district auditorium, he did private security for several different Nice-n-Easy retail stores and he worked part-time for some local police departments although the Utica Police Department had a rule against this.  Conley said he was terminated for "lying to the police chief" about "working off duty employment while [he] was on duty."  Conley then went to work for the Town of Frankfort Police Department on a part-time basis, but when he received another part-time offer from the Village of Frankfort, Jim Getman told him he would have to choose between the two departments.  According to Conley, the Village allowed its officers to

---

[7]

According to Herrman, all of the standard issued badges at the Village of Frankfort Police Department are silver with the exception of those issued to supervisors and chiefs.

work for more than one agency, but Getman did not want Town of Frankfort Officers working for any agency other than the Town of Frankfort.  Conley chose the Village because he said they offered him a full time sergeant's position.  Ultimately he became the Chief after failing the civil service test once.

Conley was aware that Herrman had been asked to do an internal investigation of the incident involving plaintiff.  The only thing that Conley knew about plaintiff's allegations was what he read in the paper.  He said he read that plaintiff said he pushed him over a car and he sustained injuries from that.  Conley knew that Herrman had tried to talk to plaintiff about his allegations and that plaintiff would not talk to him.  He also learned after the fact that Herrman had obtained plaintiff's cell phone records after Herrman was arrested.  The only thing that Conley knew prior to Herrman's arrest was that Herrman was trying to get information that was publicly available on the computer.  Conley denied looking at plaintiff's cell phone records with Herrman on a police department computer.  Conley denied seeing any of the documents related to Herrman's requests for plaintiff's cell phone records.  Conley did acknowledge knowing about Herrman's contact with Charles Oblich.  He said Oblich was a man who said plaintiff had approached him to find out how to flood his house and file a false insurance claim.  Conley advised Herrman to contact the Attorney General's Office to assist with the investigation of this claim to prevent to the appearance of impropriety.

Conley testified that he was aware of two incidents where plaintiff allegedly told candidates in the police academy that if they paid him a certain amount of money he would get them hired by the Village.  Conley turned these allegations over to the Mayor.

Conley denied changing Officer Congdon's report after the incident involving Enea or

telling Congdon to change his report. He admitted telling Congdon not to assist Enea with the body or any of the coroners lifting the body. Conley did not know if the Herkimer County District Attorney's Office had ever investigated the allegations involving Enea. Conley said it was not the job of his police officers to assist the coroner with their job. He said they normally worked well with the coroner on unattended deaths. In the incident in question, there was no sign of foul play, the coroner pronounced the woman's death at a certain time the police needed for their report and so Conley instructed Officer Congdon to come to the scene to relieve Officer Sansone who was at the end of her shift. Thereafter, he and Officer Sansone went back to the station and Officer Sansone finished her shift. When they returned to the station, Enea called Officer Sansone on her cell phone and yelled at her, wanting to know why she left the scene when he had not given her permission. Conley then returned to the scene and told Enea not to yell at his officers and not to tell his officers what to do, especially when the Chief was on the scene. Conley denied that he touched Enea but acknowledged that Enea said that he did. Conley recalls that the state police showed up at the Department and advised Enea after the alleged assault that there had been no crime committed and that their conclusion was it was a "minor verbal disagreement." Conley denied telling plaintiff he wanted him to talk to Enea's stepmother about the complaints against him. He also denied asking plaintiff to change his testimony about the Griffin case.

Conley said one of his officers told him that an ex-girlfriend had gone on a date with plaintiff and he tried to forced her to perform a sex act and that she was going to file charges in Madison County. Conley later heard that this complainant did not want to follow through with her complaint out of embarrassment. Conley later received a call from an investigator with the

Madison County Sheriff's Office concerning the allegations. Conley was told there were two or three other girls that had made complaints. Conley said there was also an investigator's badge stolen from the supervisor's office and he received reports that plaintiff was flashing an investigator's badge at The Varick bar and told a woman she had to show him her thong. Plaintiff denied having the badge when Conley asked him.

Conley acknowledged having a disagreement with Jim Getman about a case once where a woman had come to the Village Police Department to swear out a complaint against her boyfriend for harassment that occurred at a pizza shop on Main Street. When Conley arrived at the residence to pick up the suspect, Jim Getman already had him in custody. Conley told Getman the case was a Village matter within Village jurisdiction. Conley told Getman the complainant was at their station and he told Getman to release the suspect. Getman refused to do so. So Conley said he would go to the District Attorney's Office and complain to them about the matter. Getman threatened to arrest Conley if he didn't get off town property. Conley asked Officer Quinn to stay with the prisoner, went to the District Attorney's Office and they called Jim Getman and told him to release the prisoner. Conley denied threatening Getman in any way during this disagreement.

Insofar as the events of February 22, 2010, Conley says "nothing" happened. Conley says he remembers meeting with plaintiff in his office. Conley received a call from a federal probation officer saying that Officer Michione had been placed on federal probation due to his involvement in an asbestos removal case. Plaintiff had previously told Conley that he was going to court with Michione and that the charges were going to be dropped or dismissed and that everything was going to be alright. Both plaintiff and Michione had come back from the court proceedings and

told Conley after Michione was sentenced that everything had been dropped and Michione was not on probation. So when the probation officer called Conley, Conley was upset. Conley called plaintiff in and told him he realized that the incident wasn't really plaintiff's fault because it was Michione who should have come to him to tell him about it.

Conley said he asked plaintiff to leave his office and plaintiff refused. Conley got upset with him and opened the door and said "Come on, Sam. Let's go. That's enough. . . . Leave." He called Michione in next and had a long talk with him about why he had lied. Michione turned in all of his gear that day understanding that he could no longer serve as an officer. Conley said that after he left the station, he was driving up Cemetery Street and he saw plaintiff parked in the fairgrounds parking lot. Conley pulled alongside of him in his unmarked car. Conley said he pulled up very close because it was a cold night and it was snowing. He rolled the window down and told plaintiff to go the station and relax for the rest of his shift. He apologized for yelling at him in his office. Conley said he told plaintiff it was not his obligation to tell the Chief that his friend had received probation and then he left. Conley said he backed out and he left. He said he never got out of his car. He said he "never, ever raised [his] hand to one of his officers, including plaintiff. It never happened." Conley denied touching plaintiff, making any verbal threats to plaintiff, sitting in his car outside plaintiff's house or any of the other allegations of threats and abuse in the complaint. Conley also denied that he ever borrowed any money from plaintiff at any time. He did, however, acknowledge borrowing $2500 from Pat Fraccola at the Turning Stone Casino once and paying it back.

Conley said over the course of events in this case, plaintiff's father threatened to kill him and Mayor Moracco. Conley said this incident occurred a day or two after plaintiff accused him

of assault.  Conley said he went to Toma's Restaurant to order lunch to bring to work with him and the owner told him to wait.  Then the owner told him that someone wanted to talk to him and escorted him to the backroom.  When the owner brought Conley to the backroom, he saw plaintiff's father, Sam Ameduri, Sr..  He asked Conley why plaintiff had not gotten a job at the Turning Stone Casino gaming commission when former Village police officer Pat Fraccola had supposedly promised the job to him.  Ameduri showed Conley an article in the newspaper that said someone else had been hired for the most recent opening on the casino gaming commission. Ameduri said he was going to the casino to confront Fraccola to find out why his son did not get the job.  Conley said Ameduri was upset.

Right then, Conley said he received a telephone call from Officer Sansone who said that plaintiff had just called in for the rest of the week with some type of injury to his knee.  Conley wanted to know what was wrong with him but Officer Sansone had no further information. Conley said that plaintiff was "always trying to get out of working shifts."  Conley tried to call plaintiff, but he would not answer his phone.  So Conley asked Mr. Ameduri what was wrong with his son and Mr. Ameduri said he did not know.  Ameduri said "When I talked to him, he didn't say a word to me."  Ameduri asked the owner of the restaurant if he could use his phone, but the restaurant kept getting calls for lunch so it was impossible for Ameduri to make a call. Conley told Ameduri that he had to get to work, but to tell plaintiff to call him.

Conley said he went home to change and while he was there, he received a phone call from an ex-officer, Tom Spagnola, who was at the police station.  Spagnola told Conley that Mr. Ameduri was in the parking lot threatening to kill Conley.  Spagnola told Conley to call the mayor and let him know what was going on.  Conley said he called the mayor and then Spagnola

called him back and told him that Ameduri was threatening to kill the Mayor too. Conley said that Ameduri had a "reputation" for assaulting people and "doing crazy" things.

Plaintiff was also arrested for domestic violence for allegedly assaulting his wife in 2008 although plaintiff denied the charges. Conley testified that plaintiff was taken into custody by a state trooper, but he threatened to punch a Town of Frankfort police officer who was also on the scene.

Patrick Fraccola testified that he was employed by the Village of Frankfort Police Department on two different occasions in 2008 and then from November 2009 to January or February 2010. He had training at a federal law enforcement academy and worked for the United States Treasury Department. He was employed full-time for the Environmental Protection Agency in 2008 and was hired as a part-time officer for the Village. Conley thought Fraccola would be an asset in terms of teaching his officers proper procedures. Fraccola worked more or less as a quasi-supervisor or an assistant to the Chief. Fraccola said he quit the Department in 2008 because Conley told him he "may be" under investigation and he did not want Fraccola to get "dragged into it." Fraccola said he never saw Conley do anything illegal while he worked there.

Fraccola returned to the Village to work on a part-time basis in 2009 after his wife died. Fraccola testified about the "rift" between the Town of Frankfort Police Department and the Village of Frankfort Police Department. He said that an officer employed by the Village named Time Bassett was fired by Conley because he was suspected of "giving information" to the Town Police Department about the Village Police Department's work schedule. Fraccola said plaintiff told him that Conley said he would "kick [Bassett's] ass" if he said anything about the

Department.  Fraccola was also told that Conley threatened Jim Getman by saying he would "[b]reak his fucking skull."

Fraccola said that the Mayor asked him to conduct two internal investigations of Conley while he worked for the Department.  One involved allegations that Conley had threatened the coroner Enea at an unattended death while Conley said he was merely sticking up for Officer Sansone who said Enea use inappropriate language with her.  The other investigation involved plaintiff's attempt to start a union.  According to Fraccola, the Mayor asked Fraccola "What the fuck's your buddy doing starting this union bullshit?  You know, he wants to fucking cause trouble.  If he wants to cause trouble, I'll give him trouble.  How about if I get rid of the whole f-ing police department.  I'll make him part-time.  You know I'll fix his ass."  Fraccola claims that defendant Conley was present during this conversation.[8]  Fraccola claims that he told plaintiff what the Mayor said and plaintiff did not take any further steps toward forming a union because "the message was clear - he knew he would lose his job if he did."  According to Fraccola, defendant Conley told plaintiff to "start a union and fuck the Mayor."

Fraccola said he witnessed defendant Conley and the Mayor post derogatory comments about plaintiff on the Topix website but he doesn't know what they wrote.  Fraccola said that Conley yelled at plaintiff for not taking Officer's Sansone's calls about procedure when she was on duty and had questions.  Plaintiff had told Fraccola he was annoyed with Sansone's excessive

---

[8]

During his deposition, Conley testified that when plaintiff approached to discussion a union, he was neutral about it because he couldn't be involved as the Chief.  He said that a union neither helped nor hurt him so he had no opinion on it and that plaintiff and his officers could do what they wanted, he could not stop them.

phone calls and either didn't hear the phone or decided not to answer her calls.[9]

Fraccola said Conley "didn't approve" of the way Officer Congdon wrote up his report on the Enea incident. Fraccola testified "I don't know if he said that I didn't give him that order, you know, but he said, Tell him to take that out of there." When Fraccola approached Congdon about changing his report he only changed "minor" things. According to Fraccola, the next day when he arrived at work, the locks were changed on the supervisor's room. He had to turn in his supervisor's key. "[He] was no longer supervisor." Fraccola acknowledged that Conley never actually told him he was demoted, but "the actions . . . were taken." Thereafter, Harold Griffin sued Conley and the Village. Between the lawsuit, the Enea incident and the way plaintiff was being treated, Fraccola felt he had to quit the Department. Fraccola felt that plaintiff was being treated unfairly and he was the go between plaintiff and defendant Conley. The "stress" of it was too much for Fraccola. Fraccola testified that he heard Conley call plaintiff a "dumb motherfucker" a number of times although he couldn't give a number. Fraccola was also running for Town of Frankfort Supervisor in November 2009. Plaintiff was helping him with his campaign. If elected, he would have had the authority to appoint the officer in charge of the Town Police Department.

Fraccola said he was aware of a particular dispute that took place between plaintiff and defendant Conley on January 19, 2010, after the fact. He was told on the telephone by plaintiff that Conley had "just pulled the badge off [his] chest." Plaintiff told Fraccola "I want to leave. What should I do?" Plaintiff told Fraccola he was sick. Fraccola said plaintiff and Conley were

---

[9]

During his deposition, Conley denied ever yelling at plaintiff about this issue or knowing anything about it but he said he encouraged all of his officers to help each other out.

fighting and he heard Conley yelling in the background. Fraccola told plaintiff if you're sick, then just go." Conley then yelled "Yeah, you go. You're fired." Plaintiff said "See how he treats me? See how he's always talking to me?" And then Conley said "Tell him the whole story." Fraccola finally just told him to just go to the hospital if he was sick. Later, plaintiff called him back on his way to the hospital and said that the incident was way beyond him being sick. He told Fraccola he had loaned $500.00 to Conley and Conley never paid him back. Fraccola said he loaned $2500.00 to defendant Conley and although he claimed Conley never paid him back, Conley actually repaid nearly $1000.00 of the loan over time. Fraccola said Conley borrowed the money during the Herkimer County Fair when Village police officers work security. He said Conley approached him and said he had a bad day at the casino and he had to "pay the guys."

With respect to the incident on February 22, 2010, Fraccola said plaintiff called him and Fraccola was hesitant to show up and hear about plaintiff's latest "drama" with defendant because he had plans. Fraccola took a shower and plaintiff called him again wanting to know where he was. When Fraccola finally arrived at the Fairgrounds, plaintiff seemed "frantic" trying to show him tire marks and tracks in the snow where there had been a scuffle between he and Conley. Plaintiff told Fraccola that Conley had beat him up and tried to choke him. Plaintiff wanted to call the state police. Fraccola told him not to. Fraccola suggested calling the Mayor but plaintiff said the Mayor would just brush the whole thing "under the rug." Fraccola told plaintiff to call the District Attorney's office. Fraccola said he "didn't want to be a part of the scene at that time." When pressed, Fraccola said he didn't remember the details of what plaintiff told him about the incident with Conley. He said he thought plaintiff told him he was thrown over the fender. He did not remember seeing any damage to plaintiff's car. He said it looked like there was snow

"disrupted" on the ground, but he could not say which side of the car it was on. He did not recall any damage to plaintiff's uniform.

Fraccola said that Conley never threatened him "to his face," but he heard from plaintiff that Conley called plaintiff on the phone and said "You and Pat are dead." Fraccola said plaintiff told him Officer Getman traced the call from plaintiff's house to a gas station down the street from Conley's house and that Getman acquired cameras which showed Conley's car driving in the driveway "around that same time of the call and then driving out" although the cameras were not covering the phone booth.

John Congdon testified that he's been employed as a Village of Frankfort Police Officer since 2008. In connection with the incident between defendant Conley and Enea he testified that he was called to the scene at approximately 7:00 a.m. when Officer Sansone would have been getting off her shift. After he arrived, Conley and Officer Sansone left the scene. According to Congdon, Conley wanted Sansone back at the station to finish her reports and get her off shift. Congdon said that the coroner Enea then started asking him a number of questions that he did not know the answers to because he had not done the report in the unattended death. Enea asked Congdon for Sansone's phone number and then said he knew her phone number. Congdon said then Enea called Officer Sansone. According to Congdon, all he heard of the conversation was that Enea said "[w]e need to keep this professional." Congdon had heard Enea and Officer Sansone had a previous personal relationship. Subsequently, Conley and Officer Sansone came back to the scene and Congdon observed Conley telling the Enea "don't yell at me" or not to yell at one of his officers. Congdon did not see Conley put his hands on Enea. He was interviewed by the state police and told them the same thing.

Conley told him not to assist the coroner with moving the body out of the building. So later when the coroner asked him to assist him with moving the stretcher, Congdon declined. Congdon said Conley asked him why he had "put so much in his incident report" concerning the Enea matter. Congdon did not remember discussing his report with Pat Fraccola.

Congdon was demoted at one point because he failed to pick up calls from Officer Sansone and other officers who would call to ask questions about procedures. He did not recall the same thing ever happening to plaintiff. Congdon has seen Conley looking at Topix but he does not know if Conley has ever posted on the website.

James Getman testified concerning his interactions with defendant Conley. His version of the disagreement that occurred over the woman who filed a complaint of harassment in the Village was drastically different than Conley's. Getman stated that the woman came into the **Town's** precinct and complained that she had been harassed, but because the crime had occurred on Village property, Getman told her she would have to go the Village Police Department to file a complaint. Getman said she was having trouble understanding his directions to the Village Police Department Office so he decided to take the complaint himself. He secured the complainant's deposition, went to the suspect's residence, interviewed him and took him into custody. When he was driving down the street with the suspect in his car, he saw Conley and Officer Quinn in two Village police cars coming down the street. Conley flashed his lights at Getman so Getman stopped to see what he needed. Conley told Getman to "stay in Town where [he] belonged." Getman said he didn't respond and kept driving." When Getman pulled into the Town Police precinct parking lot, Conley pulled in behind him at a high rate of speed and told him to "release the prisoner, little boy." Getman told him to stay away or he would be arrested. Getman said

28

Conley threaten to "crack [his] skull." According to Getman, Conley yelled and screamed to point it drew the attention of the Town supervisor.

Getman also testified that he investigated a complaint by plaintiff that he had received a threatening phone call from defendant Conley wherein Conley threatened plaintiff and Pat Fraccola. Plaintiff gave Getman the information from the caller identification on his phone and said Conley had made calls from that phone before. Getman traced the phone to a convenience store on Culver Avenue and made contact with the store owner to obtain video footage. Getman also obtained contact with Verizon and obtained outgoing telephone numbers from the phone during the time frame in question. Getman forwarded the information to the District Attorney's office for prosecution. Getman said that the still photographs from the video footage were enhanced and he was informed that the prosecutor's office said it showed Conley's vehicle which is parked at Proctor High School "all the time." Getman did not hear anything further from the District Attorney's office concerning prosecution of Conley. He later learned that the phone records taken from the phone were inaccurate since they did not account for daylight savings time.

Getman also made a report to the Herkimer County District Attorney's Office when plaintiff complained of seeing Conley's car parked on the street in front of his house. The District Attorney's Office informed Getman that Conley had the right to be parked on a public street and that Conley, as Chief, had the right to check on his officers.

Getman testified that on February 24, 2010, he received a call from plaintiff saying that his father was going down to the Village Police Department because he was upset about what had happened to plaintiff. Getman responded to the call and plaintiff was in the parking lot and said

29

Conley had assaulted him. Getman told him he was going to have to report it. Getman contacted the Mayor and handed his cell phone to plaintiff. Plaintiff then told the Mayor what had happened with Conley. Getman did not open a Town of Frankfort police investigation of the incident involving plaintiff and Conley.

Getman testified that he was aware of the incident involving Conley and Enea because his Department was asked to respond. In talking to Enea he learned that there had been some kind of confrontation between he and Conley and that Conley had slammed him into the wall. Getman said he contacted the Mayor of Frankfort and told him they had a "serious situation." According to Getman the Mayor told him, "I don't know what I'm going to do with him," referring to Conley. Getman said, at that point, "[he] wasn't sure [he] had heard, but [he] believe[d Conley was] going through some marital problems or something along those lines, maybe he [was] stressed out." Getman said he told the Mayor he should "have him talk to somebody" and he "might want to relieve him of his duty weapon." Getman said the Mayor said Conley was "out of control."

Getman said he heard from a number of people that Conley talked unfavorable about him all the time in public and on the website Topix. Getman testified that he received the Emergency Information Request Forms that Herrman had submitted to Verizon Wireless with the information about plaintiff's cell phone records from Officer Brandon Jones of the Village of Frankfort Police Department. Within two months after receiving these records from Jones, Jones began working as an officer for the Town Police Department where he made more money.

Brandon Jones testified that he began working in the Village of Frankfort Police Department after working for the City of Utica Police Department for six years. He said he was

30

terminated from the Utica Police Department after losing an arbitration case in a disciplinary matter. Jones said he saw pages coming off the fax machine as he was relieving defendant Herrman on the day shift. Herrman told him to take the pages and put them in his mailbox. Jones said he thought the pages might have been plaintiff's cell phone records because he thought he overheard defendants Herrman and Conley saying they were plaintiff's cell phone records. Jones never saw Conley look at the records. Jones said he recalled Herrman and Conley having a conversation about obtaining records online on a website like peoplefinder.com or whitepages.com.

Plaintiff testified at his 50-H hearing in this matter that immediately after he got up off the ground defendant Conley was already in his car leaving. Plaintiff said he then called Pat Fraccola who told him to call Investigator Massocco from the Herkimer County District Attorney's Office. While he was waiting for Massocco to call him back, plaintiff said went back to his patrol car and continued to work. Plaintiff said he did not realize he was injured until the next morning. When he returned to the police station, he did not make a notation in the daily log or the daily activity report regarding the assault by Conley. He saw Officer Congdon who relieved him of duty that night but did not mention the assault to him because plaintiff said he was not a supervisor. He did not call the state police or 911 concerning the assault either because he said he was "scared" of defendant Conley hearing the call on his police radio.

In a small excerpt of plaintiff's deposition testimony, he denied soliciting $2,000.00 from a police academy candidate in exchange for getting him hired by the Village of Frankfort Police Department. Plaintiff also testified that he loaned Conley $500.00 in cash that he received from one of his tenants in rent money although he has no receipt or any written proof of the loan.

Plaintiff testified that when he asked for the money back, Conley grabbed him by his badge and said "Be careful, you won't have a fucking job here," and tried to rip the badge off plaintiff's chest.

Plaintiff also testified that Conley told him that they had to "find a way" to get Harold Griffin's wife, Michelle, fired from her job at a local window and door company because Griffin had filed a lawsuit against him for assault.

## III.    DISCUSSION

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

A.       First Cause of Action

Plaintiff asserts that his first cause of action is premised on 42 U.S.C. §§ 1983 and 1988. 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for

vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)

(quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, (1979)).  According to plaintiff's first claim,

he was deprived by all defendants of procedural and substantive due process, the right to be free

from  "unreasonable and excessive use of force," the right to petition the government for a redress

of grievances, the right to be free from "unreasonable search and seizures," and the right to be

free from "cruel and unusual punishment."  However, at no time was plaintiff a suspect in a

criminal case who was detained, held in custody, subjected to criminal prosecution or convicted

of any crime.  Nor has plaintiff suggested at any time during the course of this litigation that he

was terminated, demoted, or deprived of any hearing, process he was entitled under the law.  *See*

*Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (citing *Brady v. Town of Colcester*,

863 F.2d 205, 211–12 (2d Cir. 1988) (balance of citation omitted) ("To state a substantive due

process claim, a party must first establish that he had a valid 'property interest' in a benefit that

was entitled to constitutional protection at the time he was deprived of that benefit."  It is also

well settled that in order to establish a procedural due process violation, a plaintiff must prove

that he or she was deprived of " 'an **opportunity** ... granted at a meaningful time and in a

meaningful manner' for [a] hearing appropriate to the nature of the case."  *Brady,* 863 F.2d at 211

(quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (emphasis in original).  There is no

allegation and no evidence that plaintiff was denied any such hearing in this case.

There can be no claim that a law enforcement officer has used excessive force in the

absence of an actual "arrest, investigatory stop, or other 'seizure' of a free citizen" under the

Fourth Amendment.  *See Graham v. O'Connor*, 490 U.S. 386, 394 (1989).  Plaintiff has not pled

nor provided evidence of any "grievances" he was denied the right to petition the government for.

Finally, it well established that the Eighth Amendment's Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes," and, consequently, the Clause applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). Since plaintiff was not convicted of any crime in this case, he has not stated a claim under this Clause.

Because plaintiff has failed to state any legally viable claims under in his first cause of action, it must be dismissed. The Court notes that in dismissing the first cause of action, there are no remaining federal claims against the individually named defendants in their official or personal capacities.

B.       *Monell* Claim Against Village of Frankfort

1.       Defendant Conley

In his complaint, plaintiff asserts that defendant Conley, as Police Chief in the Village of Frankfort, had been involved in "numerous other instances of inappropriate, illegal and violent conduct" all of which were well known and well publicized in the Herkimer County area." By failing to take action against Chief Conley for his prior conduct over an extended period of time, and by failing to take sufficient or any disciplinary steps against him for that conduct, plaintiff alleged that the Village established a *de facto* unconstitutional municipal pattern, practice or policy in violation of his civil rights. Under the standards of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 if the deprivation of a plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. *Id.* at 690–91; *see also Connick v. Thompson*, ⸺ U.S. ⸺, 131 S.Ct. 1350, 1359 (2011) (municipalities can be held liable for "practices so persistent and widespread as to

practically have the force of law"); *see also Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). In certain circumstances, municipal nonfeasance—including the failure to train or supervise—can qualify as a "policy" sufficient for liability to attach. *See Finch v. City of Stamford*, No. 3:10cv748 (MRK), 2011 WL 5245422, at *3 (D. Conn. 2011) ("Even municipal sins of omission can count as policies...."). In order for municipal nonfeasance—e.g., the failure to train, to supervise, or to discipline—to give rise to *Monell* liability, the alleged municipal failure must "amount[ ] to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

In *Reynolds*, the Second Circuit articulated three independent requirements that a plaintiff must meet to establish *Monell* liability:

> *Monell's* policy or custom requirement ... obligates plaintiffs to (1) establish ... defendants' duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference under *Walker [ v. City of New York*, 974 F.2d 293 (2d Cir.1992) ]; (2) identify obvious and severe deficiencies in the ... defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs.

*Reynolds*, 506 F.3d at 192.

In support of his *Monell* claim, plaintiff asserts that defendant Conley was involved in five separate instances of "coercive, threatening and violent conduct," all of which Mayor Moracco

was aware of and three of which led to litigation against the Village. Consequently, plaintiff asserts that his injuries arose from a "practice so persistent and widespread" that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials in the Village.

In the first instance, as referenced above, unlike Harold Griffin who claimed he was unlawfully and too forcefully arrested by defendant Conley for disorderly conduct, plaintiff was not a suspect under arrest at the time of his encounter with defendant and cannot claim excessive force under the Fourth Amendment. Even if this were not true, this Court has no information on the ultimate outcome or determination in Harold Griffin's claims against defendant Conley or the Village of Frankfort, nor have the parties provided the Court with any such information. The Second Circuit and the district courts within the Second Circuit have held that a plaintiff's citation to a few lawsuits involving claims of alleged excessive force is not probative of the existence of an underlying policy by a municipality, police department, or department of corrections. *See, e.g., Jean–Laurent v. Wilkerson*, 461 F. App'x 18, 22–23 (2d Cir. 2012) (plaintiff's "citation to various lawsuits involving inmate claims for excessive use of force is not probative of the existence of any underlying policy that could be relevant here."); *Jones v. City of New York*, No. 12–CV–3658, 2013 WL 6047567, at *13 (E.D.N.Y. Nov.14, 2013) ("[T]he existence of other lawsuits against the City alleging similar violations of constitutional rights also does not establish a policy of of the City") (citing *Jean–Laurent* 461 F. App'x, at 22–23); *Peterec v. Hilliard*, No. 12–CV–3944 (CS), 2013 WL 5178328, at *11–12 (S.D.N.Y. Sept.16, 2013) (a single similar lawsuit is insufficient to give rise to a *Monell* claim); *Ostroski v. Town of Southold*, 443 F. Supp.2d 325, 345–46 (E.D.N.Y. 2006) (citations omitted):

> [T]he mere fact that a number of lawsuits have been filed, without any information as to whether the suits are meritorious or spurious, or alternatively, any evidence that the municipality ignored such complaints such that it constituted deliberate indifference to any potential problem of excessive force, does not assist a fact-finder in determining whether the [defendant] Town ... actually has a historical problem of its police officers using unconstitutionally excessive force in the performance of their duties.

*Ostroski, 443* F. Supp.2d at 346.

With respect to plaintiff's claim that Coroner Daniel Enea was assaulted by defendant Conley, there is no evidence in admissible form before this Court establishing that defendant Conley actually assaulted Enea. There are no affidavits from any witnesses who actually saw Conley attack Enea. The fact that the Mayor knew about Enea's allegations demonstrates nothing more than he knew there had been **allegations** raised against the Chief of Police. As a threshold matter, the Court has no evidence in this record that any lawsuit was actually filed by Enea against defendant Conley. Moreover, assuming *arguendo* that such lawsuit exists or existed, a municipal liability claim against the Village arising from Conley's interaction with Enea, without more detail, cannot support the conclusion that the Village was deficient in its management of Conley. *See Ostrowski*, 443 F. Supp.2d at 346 (citing *Jacobson v. City of Nashua*, No. CIV 01-165-B, 2002 WL 1349515, at *6 (D. N.H. June 19, 2002) (evidence of the filing of three lawsuits against particular officer without further detail could not support conclusion that municipality's response to lawsuits was constitutionally deficient)).

Plaintiff also cites an incident wherein defendant Conley and Jim Getman got into a "tiff" over who had jurisdiction over an arrest in 2006. Plaintiff claims that Conley threatened to "crack" Getman's skull. Plaintiff asserts that the Mayor was aware of this altercation and told Conley to apologize. The Court notes that the "turf war" between the Village of Frankfort and

Town of Frankfort Police Departments is more than evident from the ample record in this case.

While Mayor Moracco did tell defendant Conley to apologize for his "vulgar" language in

reference to the incident with Getman, and to "act professional," he also testified specifically that

he did not write Conley up for the altercation. Moracco stated he believed that Getman was

trying to make a "name for himself" and wanted "complete control" over both police agencies.

This incident hardly qualifies as evidence that the Mayor knew or should have known that Conley

was "coercive, threatening and violent" toward anyone, particularly his fellow officers.

Plaintiff asserts that the Village's hiring, retention and supervision of defendant Conley

demonstrates its deliberate indifference to the rights of Village inhabitants. Specifically, plaintiff

charges that Conley was hired by the Village of Frankfort after being "ignominiously fired" from

the City of Utica for "untruthfulness and lying to his Chief." In investigating defendant Conley's

suitability for employment, plaintiff charges that Mayor Moracco "got most of his information

from the newspaper," and did not "even bother" to read the arbitral award that resulted in Conley

being fired. In fact, the record clearly shows that Moracco and another member of the Village

Board at the time Conley was hired, took the time to schedule an interview with both the Chief

and Assistant Chief of Police in the Utica Police Department. The Assistant Chief, though not

willing to answer all of Moracco's questions about Conley due to ongoing litigation, answered

some of them. Moracco knew that Conley's termination had something to do with lying about

working part-time making "[bank] deposits" while on duty with the Utica Police Department.

Moracco asked the Chief and Assistant Chief if there were any other concerns about Conley in the

12 or 13 years that he had been employed in their Department and they said "No." Moracco also

spoke to a 25-year veteran investigator for the Utica Police Department who told him the same

thing about Conley.

Finally, plaintiff claims that defendant Conley tried to pull his badge off his uniform and threatened to terminate his employment. The allegations surrounding this claim involve plaintiff having loaned money to defendant Conley. Plaintiff claims that he told the Mayor about this incident. During his deposition, the Mayor denied plaintiff had ever complained to him about this incident involving his dispute with Conley over the loan. In the first instance, the actual substance of this particular dispute between Conley and plaintiff was a personal, financial matter. According to plaintiff's allegations, it does not seem to have any relationship to the dispute that led to the assault which is the subject of this lawsuit, that is, plaintiff's refusal to give false testimony in connection with the Harold Griffin matter. However, even assuming the truth of plaintiff's allegations that Conley threatened his job, and attempted to pull his badge off his chest, this incident is not sufficient to demonstrate that the Village is liable for Conley's alleged conduct on February 22, 2010.

Plaintiff has not established that a genuine dispute exists as to whether the alleged deficiency in the hiring, supervision, or failure to discipline Conley was "so patently inadequate to the task as to amount to deliberate indifference." *Reynolds*, 506 F.3d at 192–93. " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Commis of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). In *Walker v. City of New York*, the Second Circuit discerned three component requirements "that must be met" for a plaintiff to establish the requisite "deliberate indifference":

> First, the plaintiff must show that a policymaker knows to a moral certainty that . . . employees will confront a given situation . . ..

> Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . .. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker,* 974 F. 2d at 297–98 (quotation marks and citations omitted).  Plaintiff's claim founder on both the first and third prongs.

First of all, there is no evidence in this case of a "history of employees mishandling the situation" such as Conley previously assaulting plaintiff or other officers.

Moreover, no reasonable juror could infer that the Village's inaction with respect to the incident with the badge caused the deprivation of plaintiff's rights as he alleges on February 22, 2010.  Plaintiff is required to establish more than but-for causation—i.e., that but for the alleged inadequate supervision or discipline of Conley that he would not have been injured.  Plaintiff must demonstrate that the municipal "policy" at issue was the "moving force" behind his injuries. *See City of Canton*, 489 U.S. at 389.  As the Supreme Court made clear, "the identified deficiency . . . must be closely related to the ultimate injury." *Id.* at 391.  Plaintiff "must still prove that the deficiency in [supervision or lack of discipline] actually caused" the conduct that violated his constitutional rights. *See id.*  This standard is akin to proximate cause. *See Cash v. Cnty. of Erie*, 654 F.3d 324, 342 (2d Cir. 2011) (noting that " 'proximate cause,' although derived from tort law, fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983").

The alleged inadequate supervision or discipline here was the Village's alleged failure to foresee: 1) Conley's prior termination from the City of Utica Police Department; and 2) a personal, financial dispute between plaintiff and Conley that became more heated and ultimately

involved Conley grabbing plaintiff's badge and threatening his job would lead to the events on February 22, 2010. The Court finds that the Village's alleged failure to take steps to discipline Conley him more severely for that alleged misconduct—is not related to the alleged assault against plaintiff on February 22, 2010, which plaintiff claims concerned his failure to testify falsely on behalf of defendant Conley in the Griffin matter. Conley's previous alleged "misconduct" in the City of Utica Police Department was of a different kind and magnitude than the assault alleged in the complaint. Moreover, the prior "badge incident" put the Village on notice that plaintiff and defendant Conley did not have a good personal or working relationship. Plaintiff did not assert during this "badge incident" that Conley grabbed him or any part of his body, he said that Conley grabbed his **badge** and threatened his **job,** not his **person.** According to plaintiff's complaint, Conley committed a violent **assault** upon plaintiff on that date and continued to threaten and harass him thereafter. Neither of the prior "failures" to discipline, supervise, or take note of Conley's alleged bad behavior by the Village are causally related to the injuries set forth in plaintiff's complaint. *See City of Canton*, 489 U.S. at 393. Thus, plaintiff's *Monell* claims against the Mayor and Village officials based on negligent hiring, failure to supervise or failure to discipline must be dismissed for want of proximate causation.

By separate letter motion, plaintiff asks the Court to consider that defendant Conley himself is a "policy maker" to establish liability for the Village, as it did in the prior decision of *Griffin v. Village of Frankfort*, No. 10-CV-627, 2012 WL 4491276, *4 (N.D.N.Y. Sept. 28, 2012). There, this Court held:

> [w]hile [Conley denied at his deposition having actually written any police policies during his tenure as Chief and only acknowledged that he was responsible for enforcing the policies of his predecessor, he also testified that no Village official including the

Mayor and members of the Town Board gave him instructions or criticism concerning his operation of the Police Department. Thus, the record certainly demonstrates or suggests that Conley ha[d] final policy-making authority in the Village, at least insofar as police matters go.

2012 WL 4491276, at *4. Plaintiff states on February 26, 2010, four days after the incident which he alleges occurred in this case, Conley wrote a memo that advised Department members "to have no contact with Sam Ameduri and not to allow him into the station for any reason." Plaintiff alleged in his complaint that defendant Conley threatened, stalked, assaulted, terrorized and made death threats against him, all arising from his failure to change his testimony in the Harold Griffin case. Plaintiff has submitted no sworn testimony, no affidavit concerning these allegations in opposition to defendants' motions and his complaint in case is not verified. There is only a small portion of plaintiff's 50-H hearing transcript and an even smaller portion of his deposition transcript in the record. The only issue addressed in the portion of plaintiff's deposition transcript in the record is what happened **after** he was allegedly assaulted in terms of who he notified. The excerpt of plaintiff's 50-H hearing concerns the above-referenced "badge incident." Plaintiff can create a genuine issue of material fact only by presenting competent, admissible evidence concerning the existence of an unlawful policy on the part of the Village which defendant Conley perpetrated by virtue of his position as Chief. *See Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F.Supp.2d 569, 574 (S.D.N.Y. 2004) (citing *Sarno v. Douglas Elliman–Gibbons & Ives*, 183 F.3d 155, 160 (2d Cir.1999)). Plaintiff has failed to present any such evidence.

The only document plaintiff has submitted is the decision of the New York State Workers Compensation Board which established his claim for work-related injuries. In his Statement of

Uncontested Material Facts Pursuant to Local Rule 7.1 (A) (3), plaintiff states that by way of this decision and a later Amended Decision, the Board awarded plaintiff benefits "for orthopedic injuries suffered as a result of an accident that occurred on February 22, 2010," and "Post Traumatic Stress Disorder arising out of the incident of February 22 , 2010."  In the decision, the Board Panel **summarized** plaintiff's testimony in connection with his allegations that defendant Conley had assaulted him, resulting in injuries to his back, right knee and right elbow.  Thus, any testimony that plaintiff gave in the case concerning the history of his acrimonious relationship with defendant beginning with the Griffin matter and allegations that threats and harassment may have continued after the assault that occurred in this case must be deemed background to the operative question whether plaintiff had sustained a work injury.  While the conclusion that plaintiff suffered a work-related injury at the hands of defendant Conley may be entitled to preclusive effect, there is no indication that the facts recited in the Workers Compensation Board decision are the type of "discrete" factual findings that this Court must give preclusive effect to.  *See Tran Antoine Aviation Co., Inc.*, 624 F. Supp. 179, 180 (S.D.N.Y. 1985).  Plaintiff could have submitted the transcript of his testimony before the Workers Compensation Board.  Indeed, plaintiff did submit a portion of Mayor Frank Moracco's testimony before the Workers Compensation Board.  Plaintiff could have submitted his entire deposition transcript or an affidavit or a verified complaint.  As the records stands, the Court has no evidence in admissible form from plaintiff setting forth the details of the alleged unlawful policy that he claims caused his injuries in this case.  Plaintiff's *Monell* claims against the Village must be dismissed.

To the extent that plaintiff argues that he is entitled to summary judgment on his *Monell* claim against the Village on the basis of the Workers Compensation Board decision and collateral

43

estoppel, he is mistaken.  As referenced above, although the Village was a party to the administrative review of plaintiff's claims for benefits, the Board did not consider any part of the plaintiff's constitutional claims in the Workers Compensation case.   The case did not involve or resolve whether the Village of Frankfort or defendant Conley violated plaintiff's constitutional rights.  Consequently, plaintiff's motion for summary judgment must be denied.

2.      Defendant Herrman

Plaintiff asserts that the Village hired defendant Herrman in spite of his criminal record and his uncertified status and these factors led to Herrman violating plaintiff's constitutional rights by filing illegal Emergency Information Requests with Verizon Wireless and obtaining his cell phone records.  Plaintiff has no *Monell* claim against the Village if he cannot prove that any of his federal constitutional rights were violated by Herrman in the first instance.  The Fourth Amendment was not implicated by defendant Herrman having obtained plaintiff's cell phone records in this case.  Plaintiff asserts in his complaint that the "true reason" defendant Herrman[10] sought his cell phone records was to discredit him in the civil or criminal proceedings that would follow the February 22, 2010, incident.  As referenced above, there is no evidence in admissible form in this case from plaintiff concerning the "true reason" for Herrman's actions because he did not submit his deposition transcript on this issue or an affidavit.

Moreover, Herrman's receipt of plaintiff's cell phone information from Verizon Wireless was not a violation of the Fourth Amendment.  In *Smith v. Maryland*, 442 U.S. at 742–743

---

[10]

Plaintiff's complaint alleges that defendant Conley also sought his cell phone records but there is no evidence in the record to support this conclusory claim.  There are suggestions in the record by various witnesses that Conley knew Herrman was getting the records after the fact or saw records on a computer but there is no evidence that defendant Conley sought or obtained plaintiff's cell phone records.

(1979), the Supreme Court held that the installation of a pen register was not a "search" within the meaning of the Fourth Amendment. The Court noted that while most people may be oblivious to a pen register's functions, they presumably understand that one common use is to aid in the identification of individuals making annoying or obscene phone calls. *See id.* To that end, the Court stated that while subjective expectations of privacy cannot be gauged scientifically, telephone subscribers cannot possibly harbor any general expectation that the numbers they dial will remain secret. *See id.* The Court observed that all telephone users realize that they must "convey" phone numbers to their telephone company, since it is through the company switching equipment that telephone calls are completed. *See id.* Thus, the Court concluded that, even if a defendant harbored some subjective expectation that the phone numbers he dialed would remain private, his expectation was not one that society was prepared to recognize as reasonable. *See id.* The Court also noted that it is well settled that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties and that by making a phone call, he had to convey the number to the phone company if he wished to complete his call. *See id.* Thus, while a person may have calculated that the **contents** of his conversation would remain private, no one could rationally think that the **number dialed** would remain private. *See id.* Plaintiff argues that there some evidence in the record that Herrman used websites on the internet such as peoplefinder.com or yellowpages.com with "reverse lookup" features to do further research on the data provided by Verizon. However, such information is freely available to the public on the internet for a charge and plaintiff has no reasonable right of privacy in such information. *See U.S. v. Cox*, 190 F. Supp.2d 330, 332 (N.D.N.Y. 2002) (citing *United States v. Kennedy*, 81 F. Supp.2d 1103, 1110 (D. Kan.2000) (defendant's constitutional rights were not violated when Road Runner

divulged his subscriber information to government; defendant did not demonstrate objectively reasonable legitimate expectation of privacy in his subscriber information) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)) ("[W]hat a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection."); *Smith*, 442 U.S. at 743–44 ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.")). While the record reveals that Herrman obtained the numbers plaintiff dialed on his phone from Verizon and the identities or locations of persons called through information obtained on the internet, there is no evidence in the record that Herrman obtained, learned, discovered or detected the **content** of any of plaintiff's phone calls during the course of his investigation. Thus, the Court finds that defendant Herrman did not violate plaintiff's Fourth Amendment rights by obtaining plaintiff's cell phone records.

Contrary to plaintiff's arguments, Herrman is not collaterally estopped from denying that his actions were **unconstitutional** by reason of his so-called *Alford* plea in the underlying criminal action. An *Alford* plea, by its very nature, is accepted on the explicit basis that the person making the plea does not admit having committed the charged acts. *See Howard v. Stature Elec., Inc.*, 72 A.D.3d 1167, 1169 (3rd Dep't 2010). Plaintiff cites a number of cases in support of his position that collateral estoppel applies in this case because of Herrman's *Alford* plea. The only one that is even arguably relevant to the facts at bar is *Merchant's Mutual Ins. Co. v. Arzillo*, 98 A.D.2d 495 (3d Dep't 1984). There, the Appellate Division rejected the claim of a prior felon who, after having entered a *Serrano* or *Alford* plea to arson, opposed summary judgment for liability on the underlying fire. *See id.* at 505. The Court found that though the defendant "d[id] not expressly admit to the underlying facts," of the crime, "nothing" in *Serrano*

46

or *Alford* suggested that a defendant is "relieved of the civil consequences of his plea." *Id.* (citing *People v. Serrano*, 15 N.Y.2d 304 (1965); (*North Carolina v. Alford*, 400 U.S. 25 (1970)). In the prior criminal proceeding, the defendant had entered a *Serrano* plea to arson in the fourth degree, a felony. *Id.* at 501. Section 150.05 of the Penal Law provides that a person is guilty of fourth degree arson when he recklessly damages a building in which some other person had a possessory or proprietary interest by intentionally starting a fire or causing an explosion. *See id.* The Appellate Division determined that "[t]he fundamental principle underlying the concept of issue preclusion is that, in the public interest, a party shall not be heard a second time on issues previously determined and issues which, although not expressly litigated and determined, are included, comprehended and involved in the matter expressly litigated and determined." *Id.* at 506. The Court therefore found that defendant's plea of guilty in connection with the underlying fire estopped him from contesting the operative facts of the underlying crime in the action. *See id.* at 507. The record before the Court proved that defendant, after consulting with and obtaining the advice of his attorney, understood the meaning and the consequences of a criminal conviction pursuant to his plea of guilty to the criminal charge. *See id.* at 501-02. The Court found that the doctrine of issue preclusion mandated the holding that defendant's guilty plea in the prior criminal action conclusively establishes his commission of the elements of the crime for the purposes of the subsequent subrogation action. *See id.* at 502.

The facts here are entirely distinguishable from *Merchants Mutual*. Here, Herrman claimed in his deposition that he entered an "*Alford*" plea to Forgery in the Second Degree in violation of N.Y. Penal Law § 170.10 (3) and Official Misconduct in violation of N.Y. Penal Law § 195.00 (1). The "operative facts" with respect to these convictions are as follows:

> A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:
>
> 3. A written instrument officially issued or created by a public office, public servant or governmental instrumentality

N.Y. Penal Law § 170.10 (3).

> A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit:
>
> 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized.

N.Y. Penal Law § 195.00 (1).

While Herrman may not have admitted to the facts of his underlying convictions, he cannot deny that the acts he committed in the above-referenced crimes were illegal. However, there is nothing in the operative facts of these crimes that implicates the Fourth Amendment of the United States Constitution or any other right under the Constitution. Thus, plaintiff's federal civil rights claims against Herrman are neither "issues previously determined" or "issues which, although not expressly litigated and determined, are included, comprehended and involved in [Herrman's prior convictions for forgery and official misconduct]." *Merchant's Mutual Ins. Co.*, 98 A.D.2d at 506.

Because the Court has found that plaintiff has failed to allege a Fourth Amendment violation in support of his federal claims against defendant Herrman, plaintiff's *Monell* claims against the Village of Frankfort for hiring Herrman to investigate plaintiff must be dismissed and plaintiff's cross-motion for summary judgment against defendant Herrman on the issue of collateral estoppel must be denied.

D.    Harassment

New York does not recognize a cause of action to recover damages for harassment.  *See*
*Santoro v. Town of Smithtown*, 40 A.D.3d 736, 738 (2d Dep't 2007).  Consequently, plaintiff's
sixth cause of action must be dismissed.

E.    Punitive Damages

Punitive damages are not available against a municipal defendant in an action pursuant to
42 U.S.C. § 1983.  *See Krohn v. New York City Police Dep't*, 372 F3d 83, 85 n. 2 (2d Cir. 2004).
Consequently, plaintiff's claim for punitive damages against the Village must be dismissed.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that plaintiff has failed to raise a triable issue with
respect to any of his federal claims.  Because the Court elects to dismiss all of the federal claims
in the complaint, the Court will not exercise its supplemental jurisdiction to address plaintiff's
remaining state law claims.  Consequently it is hereby

ORDERED that the motion for partial summary judgment (Dkt # 67) by defendant
Herrman is GRANTED in part and DENIED in part; and it is further

ORDERED that the motion for partial summary judgment (Dkt # 69) by defendant Conley
and the Village of Frankfort is GRANTED in part and DENIED in part; and it is further

ORDERED that the letter motion filed by plaintiff for the Court requesting the Court to
consider defendant Conley as a policy maker (Dkt. # 101) is GRANTED; and it is further

ORDERED that the cross-motion for partial summary judgment (Dkt. #76) is DENIED;
and it is further

ORDERED that plaintiff's first, second, and third causes of action in the complaint are

dismissed with prejudice; and it is further

ORDERED that the federal claims against defendants Conley and Herrman in their individual and personal capacities are dismissed with prejudice; and it is further

ORDERED that the sixth cause of action is dismissed with prejudice; and it is further

ORDERED that plaintiff's claim for punitive damages against the defendant Village is dismissed with prejudice; and it is further

ORDERED that plaintiff's fourth and fifth causes of action are dismissed without prejudice.

IT IS SO ORDERED.

Date:   March 31, 2014

Norman A. Mordue
Senior U.S. District Judge